(No. 20880.
WILLIAM CARL HEALY *et al.* Appellees, *vs.* MABEL HEALY STEVENS *et al.* Appellants.

*Opinion filed October 23, 1931—Rehearing denied Feb. 11, 1932.*

HEARD, J., took no part.

DIXON, DEVINE, BRACKEN & DIXON, and CLYDE SMITH, (ROBERT BRACKEN, of counsel,) for appellants.

ELWYN R. SHAW, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

A bill was filed on behalf of William Carl Healy and John Francis Healy by Ben M. Hermsmeier, their next friend, in the circuit court of Lee county, for the partition of 560 acres of land in that county and a half dozen parcels of town property in the city of Rochelle, in Ogle county. The bill alleged that the land in Lee county and all the parcels of town property in Ogle county, except the parcel designated in the bill as tract No. 8, had been owned in her lifetime by Mary Healy, the grandmother of the complainants, who died intestate on July 13, 1928, leaving no surviving husband but leaving her two daughters, Mabel Stevens and Mary Ruth Wheeler, her four sons, Thomas F., Charles H., Winfield and Carleton Healy, and the complainants, her grandsons, her heirs. All the land in Lee county except 80 acres and all the town property in Rochelle had been owned originally by William Healy, the husband of Mary Healy, who died in December, 1914, leaving Mary Healy, his widow, and their two daughters, Mabel Stevens and Mary Ruth Healy, and their six sons, William J., John M., Thomas F., Charles H., Winfield and Carleton Healy, his heirs. William J. Healy, the father of the complainants, died on December 22, 1918, leaving his widow, Ruby C. Healy, who subsequently married Ben M. Harmsmeier, surviving, and the complainants, his heirs. At the time of his death he was the owner of an undivided one-eighth of tract No. 8 by inheritance from his father, subject to the dower of Mary Healy, and upon his death his widow became entitled to dower in that undivided one-eighth part of tract No. 8, and, subject to dower rights, the complainants became the owners of that undivided one-eighth. On

September 6, 1919, John M. Healy, William's son, died intestate, leaving no widow or descendant, and his mother and his brothers and sisters, with the exception of William J. Healy, who had previously died, and the complainants became the owners of his one-eighth of tract No. 8, so that now the complainants and the surviving sons and daughters of William Healy are the owners of the tracts numbered in the bill from 1 to 7, inclusive, as tenants in common; the two daughters and four surviving sons of William Healy being each entitled to an undivided one-seventh part and the complainants being each entitled to an undivided one-fourteenth part, and the title to tract No. 8 has descended to and is owned by the same parties to this suit in the same rights and interests as tracts Nos. 1 to 7, except that as to tract No. 8 Ruby Hermsmeier is entitled to dower in the undivided eighth part of tract No. 8. Besides the alleged co-tenants, the Equitable Life Assurance Society of the United States, a judgment creditor of one of the co-tenants, and several other persons claiming an interest in the premises as tenants or otherwise, were made defendants to the bill, which was filed on December 13, 1928. On January 7, 1929, an amended bill of complaint was filed containing allegations upon which the complainants prayed for the appointment of a receiver, and on July 5, after the order for the appointment of a receiver had been denied, an amendment by way of supplement was filed to the bill, alleging that since the filing of the original bill four quit-claim deeds had been filed for record in the counties of Lee and Ogle, all purporting to convey certain of the property mentioned in the bill of complaint, as follows: One to Mabel and Ruth, one to Ruth alone, one to Charles and Carleton and one to Thomas and Winfield, each for certain portions of the premises described in the bill and all together conveying all the premises described in the bill and all the real estate of the grantor except tract No. 8. The deeds were all dated November 16, 1926. The

bill charged that. these quit-claim deeds were not, in fact, the deeds of Mary Healy; that at the time of their alleged execution and acknowledgment she was sick and of unsound mind and was incapable of transacting any business; that the deeds were obtained from her by the fraud and undue influence of the grantees, and that they, and each of them, were never delivered in any manner sufficient to transfer or convey title. The bill further alleged that during the lifetime of Mary Healy and at the time of the execution of the deeds each of the grantees stood in a fiduciary and confidential relation to her; that at that time each of them acted, and for a long period of years prior thereto had acted, as a general agent and attorney in fact of Mary Healy and was at the time acting as her general agent and attorney in the general transaction of all her business affairs; that each of them wrote checks upon her bank account and signed her name to them; that Charles and Thomas F. Healy at the time were general managers of the affairs of Mary Healy and had been such general managers of her affairs for a long period of time, to-wit, since the year 1916, and she had and reposed full and complete confidence in each of her children, and the children, and each of them, accepted the trust and confidence and acted as trustees for her property, business and affairs and were so acting at the time of the execution of the deeds, and procured the execution of the deeds by reason of and under the influence and during the continuance of such confidential relation between Mary Healy and each of said grantees. By subsequent amendment the charge of fraud and undue influence against the grantees, except Charles and Mabel, was eliminated and this charge was confined to Charles and Mabel. The amendment further prayed that the deeds be set aside and canceled.

The answers of the defendants admitted the allegations of the bill in regard to the title of Mary Healy and the conveyances by her and alleged that in each of the deeds a

life estate was reserved to the grantor. The answers denied that the grantor, Mary Healy, was of unsound mind or incapable of transacting any business, that the deeds were obtained from her by fraud or undue influence, that they were never delivered in any manner sufficient to transfer or convey title, or that the grantees, or either of them, at the time of the execution of the deeds stood in a fiduciary relation to the grantor or was then and there acting as her general agent or attorney in fact in the transaction of her business affairs. The cause was referred to a master, who took and reported the evidence with his findings of fact and law, in accordance with which he recommended a decree of partition of tract No. 8 in accordance with the prayer of the bill and in favor of the grantees as to the validity of the deeds. Exceptions were filed both by the complainants and the defendants to the master's report. The exceptions of the defendants were overruled and the exceptions of the complainants were sustained, except the fifth, which was to the finding that on November 16, 1926, Mary Healy was of sound mind and memory and capable of transacting any ordinary business, and a decree was entered setting aside the four deeds and awarding partition of all the real estate described in the bill among the complainants and the defendants, heirs of Mary Healy. The six heirs of Mary Healy other than the complainants have appealed from this decree.

The issues in the case are the mental competency of Mary Healy, the grantor in the deeds, fraud or undue influence over the grantor exercised by Charles Healy and Mabel Stevens in the procuring of the deeds, the fiduciary relation of the appellants to the grantor, the delivery of the deeds, and the acceptance by the respective grantees of two of the deeds which were subject to mortgages.

On the question of the mental competency of the grantor the master found that on November 16, 1926, Mary Healy was of sound mind and memory and capable of transacting

any ordinary business. The complainants' exception to this finding was overruled by the court. There is no evidence worthy of serious discussion tending to show that this finding is not in accordance with the fact.

The only charge of fraud and the actual exercise of undue influence at the time of the execution of the deeds is that they were obtained by the fraud and undue influence of Charles Healy and Mabel Stevens, without stating any facts constituting such fraud or undue influence operative at the time of the execution of the deeds and procuring their execution in accordance with the will of Charles and Mabel rather than that of the grantor. The report is as barren of evidence as of allegation of any fact showing fraud or the exercise of undue influence. The only witness who testified to the circumstances preceding or attending the actual execution of the deeds was W. B. McHenry, the lawyer who actually wrote the deeds at the request of Mrs. Healy according to her directions, brought them to her for execution, was present at their execution and took her acknowledgment. He testified that one of Mrs. Healy's daughters (either Mabel Stevens or Ruth Healy) called him by telephone, asking if it was convenient for him to come to the house. He replied that it was, and Charles then came down in an automobile and took him to Mrs. Healy's house; that after going to her room and visiting a few minutes she told him she wished to have some deeds prepared, gave him the names of the persons to whom she wished the several tracts conveyed, stated that she wished to have a life estate or have control of the property as long as she lived, and asked him to prepare the deeds. She had only a general description of the property but told him how she wanted it divided. He was familiar with the property—had known it for several years. She told him who was occupying the buildings and named the buildings and the farm lands and told him she wanted to convey certain parts of her property to certain of her children. He re-

turned to the office and prepared the deeds according to her instructions. The next day, according to his recollection, he returned with the deeds which he had prepared. The legal descriptions of the farms he took from an atlas in his office, and according to his recollection he went to the city hall and got most of the descriptions for the city property from the assessment rolls, all of the city property having been in special assessment districts. The city of Rochelle not being a county seat they did not have any record of deeds and mortgages. On the day he returned with the deeds, Mabel, Charles and the nurse were in the room with Mrs. Healy at different times. When he got there he read each deed to Mrs. Healy. The persons mentioned were coming in and going out of the room at the time the deeds were read, but he could not say whether they were there at the particular time or not. They were in and out during all the time he was there. After he read the deeds to Mrs. Healy she executed them. He identified each of the deeds which were offered in evidence. After the deeds were signed he testified Mrs. Healy told him to take them and take care of them until after her death and after her death to deliver them to the children who were entitled to them. He talked with Mrs. Healy about an hour the day the deeds were executed. Neither Mrs. Stevens nor Charles made any suggestion or recommendation to Mrs. Healy of any kind with reference to the execution of the deeds. He did not remember Ruth being in and out of the room at the time but he did remember Mrs. Stevens coming in once or twice. Ruth did not make any suggestion or recommendation either to him or to Mrs. Healy. After he received Mrs. Healy's instructions he took the deeds to his office, labeled them and put them in his safe in his office. That was on November 16, 1926, the day the deeds bore date. He never talked to Mrs. Healy and never saw her after the execution of the deeds. They remained in his safe from the time they were put there until after Mrs.

Healy's death. The first thing he did with reference to the deeds after the death of Mrs. Healy was to talk to Thomas F. Healy. He met him on the street, spoke to him about the deeds and asked what they wished done with them. He talked with Mrs. Stevens also and asked what she wanted done with them, and she said she had seen Ruth and they wanted to have them recorded. He talked with Charles, and finally had the deeds recorded in the respective counties as a result of instructions from Thomas, Charles and Mrs. Stevens. On cross-examination McHenry testified that he would not say he was acting as attorney for the adult heirs of Mrs. Healy at the time he sent the deeds to be recorded. They had not consulted him professionally in regard to the deeds prior to that time. He spoke to Thomas three or four days before the deeds were recorded. Before that time none of them had said anything to him about the deeds and he had not said anything to them. He had no recollection of having talked to any of them about the deeds from the time they were executed until three or four days before they were recorded. The subject had not been mentioned at all between any of the adult heirs of Mrs. Healy and himself. He had a conversation with the attorney of the complainants in his office in Rochelle and wrote two letters to him in regard to the deeds. According to his recollection, from the death of Mrs. Healy, in July, 1928, to January, 1929, he never said anything to the Healys and the Healys never said anything to him about any of the deeds. Mrs. Healy instructed him that he should deliver the deeds to the grantees upon her death, and they were delivered to them. He was in Rochelle during all of that period and knew where the Healys lived, saw them frequently on the street, could not say that all had telephones but some of them had, and he was personally acquainted with all of them but did not say anything to any of them. Charles took him to Mrs. Healy's and went with him into the house and into his mother's room and was in

and out of the room while McHenry talked to her. Charles never talked to him about the deeds before they were made, Frank never did and Mrs. Stevens never did. He never discussed the deeds or their contents with either Charles or Frank or Mabel prior to the time they were made. He was paid for his services by a check, he thought, drawn on the account of Mrs. Healy. According to his recollection, when he put the deeds in his safe he marked them in separate envelopes. Mrs. Healy told him that that was the way she wanted her property disposed of, and she did not say anything about making a will and he did not say anything to her on that subject. She told him the deeds, as a whole, represented and expressed her wish as to the disposition of her property. She might have made reference to other property, but she said she wanted to dispose of that property in that manner. He was familiar with the real estate and knew that she was disposing by those deeds of all the real estate she owned. He knew she had two grandchildren, the sons of her deceased son William. He did not say anything about them to her nor did she say anything to him. She expressed no ill-will toward them. They were simply not mentioned. He did not know whether she knew she was disposing of all the real estate she had by the deeds. He got the descriptions of the farm lands from a plat book. He knew Healy had three farms but did not know the lands were encumbered by mortgages until they told him at the time he made the deeds. At the time he made the deeds he thought it was talked of, and Mrs. Healy discussed the mortgages on the farms. He did not remember taking any acknowledgment to two mortgages for $25,000 each on her farms. He did not remember it. He thought he had an old abstract, and perhaps two old abstracts, covering the city property. The abstracts he had in his office must have shown the descriptions the way he had them in the deeds. They were brought down to his office by Charles, he thought, at the

time he was preparing the deeds. In the course of the cross-examination McHenry was asked to take the plat book of Reynolds township, in Lee county, and from that plat dictate to the court reporter the descriptions as he put them in the deeds. He said he would not be able to separate them as to grantees, and the attorney stated he did not care about the grantees but just the legal descriptions of the property, separating them the way he separated them in the two deeds. McHenry dictated from the plat book, but stated he could not tell which part went to Thomas and Winfield and which part to Charles and Carleton. He had the plat book in front of him as he wrote the deeds and divided the 560 acres into two parts upon instructions given him by Mrs. Healy and from memoranda made at the time he received the instructions. He testified that he did not remember making any mistakes while writing the deeds or of erasing anything or making any interlineations. He knew they were never changed after they were executed. He had no recollection of having made any changes in the deeds after they were typed. They were never in the possession of anyone except himself and Mrs. Healy up to the date they were sent for record. He wrote the deeds on his typewriter in his office. On being shown the deeds it appeared that in the date line at the bottom of the deeds, and also in the date line of the acknowledgment, the word "October," which had first been written as the month in each deed and in each acknowledgment, had been erased and the word "November" written with the typewriter in its place. He had no remembrance of making a mistake in writing "October" first and then erasing it and writing "November" in its place in any of the places where they occurred, but he knew that the writing was done by his typewriter and he must have written it.

In all this examination and cross-examination of McHenry there is no evidence which can fairly be said to raise a suspicion of fraud or a suspicion of the exercise

of undue influence. Mrs. Healy was a woman of sound mind and capable of transacting her ordinary business affairs. She was seventy-seven years old and had been a widow at the time of the execution of these deeds for nearly twelve years. During the first four of those years she had relied upon her son William, the father of the complainants, in the management of her affairs. She had 480 acres of land, consisting of three farms. Two years after her husband's death she bought eighty acres more, adding to one of the farms, for $16,000, and this farm at her son's death was mortgaged for $16,500. After the death of her son William her son Thomas took his place in the management of his mother's real estate, consisting not only of the farms but of town property, and continued to manage the farms until 1925, getting grain rent for the farms and cash rent for the city property when it was rented. In 1925 her son Charles sent a representative of the canning factory to her for the purpose of renting all her farm land to the canning factory. Thomas was opposed to renting the land to the canning factory and said if that was done he was through with the management. His mother had three interviews with the canning factory's manager and leased to him all the land he could use at $15 an acre, excluding roads and buildings. The total number of acres used was 540 and the annual rent was $8190, one of the farms being rented for two, one for three and the third for five years. From that time on Charles was the manager of the real estate instead of Thomas, and the business was conducted, as it always had been conducted, in the name of Mrs. Healy. She had a bank account in her own name on which she drew checks, and a bank account was kept in the name of "Mary Healy, special," in which the rents collected from the farms and other property were deposited and upon which one of her sons who was engaged in the management of the property drew checks in her name. Her unmarried daughter, Ruth, con-

tinued to live with her mother until 1927, when she was married, and the other daughter, Mabel, was a widow, living next door to her mother and was in and out of her mother's house frequently. Both Mabel and Ruth drew checks on their mother's bank account, signing her name when she directed them to. The family lived harmoniously. There were no disagreements or ill-feeling among them. After William's death his widow, the mother of the complainants, remained a widow for five years, and Mrs. Healy, her mother-in-law and the grandmother of her children, contributed liberally to her and them during all that time. The. evidence shows that these contributions amounted to $11,416.27. After her second marriage her husband was able to, and did, take her boys into the family and support them. The record also shows that the defendants received the following amounts from their mother: Charles $2500, Carleton $6500, Thomas $2500, Winfield $2500, Mabel $2000 and Ruth $3000, a total of $19,000.

Mrs. Healy was always in debt. She inherited a debt from her husband besides the $16,500 mortgage on the land, and her indebtedness increased with the $11,000 that she contributed to the mother of the complainants and the $19,000 with which she had assisted the others, and otherwise, so that in 1926 she owed nearly $50,000, evidenced by mortgages on the land in the amount of $40,000 and indebtedness to the banks of $8000 or $9000 more. It is to be gathered from the evidence that she was generous with her children and gave liberally to them, and that the gifts made a large draft on her income, which was further reduced steadily by the six and a half per cent interest which she paid annually on more than $40,000. There is no evidence that any of the children had exercised or attempted to exercise any undue influence in the control of her actions or in the disposition of her property. By these deeds the disposition of her lands, taking into account the contributions previously made to her children and grandchildren

and the mortgage incumbrances of $50,000, which the sons assumed, resulted in a total distribution to them as follows: Charles $13,500, Carleton $17,500, Thomas $9500, Winfield $9500, Mabel $20,750, Ruth $27,250, and the complainants and their parents $11,416. This is not an equal division, but Mrs. Healy was not obliged to make an equal distribution. She was not even obliged to make a reasonable distribution of her property. She made the division in the manner which seemed best to her. No one of the recipients of her bounty has any legal right to complain. Her division cannot be set aside by the court except upon proof that it was not her own free and voluntary act but was produced by fraud and undue influence, and that proof has not been forthcoming.

The original four deeds have been certified to us by the trial court, but an inspection of them does not throw any light on any issue in the case. They are typewritten on blank forms of the ordinary statutory quit-claim deed, with no peculiarity whatever about them except the mistake which has been referred to in regard to the date, the word "October" having been first written in the date of the deed and the certificate of acknowledgment and then been erased and the word "November" written in its place. This does not constitute a sufficient basis for any inference unfavorable to the validity of these deeds under the issue in this case.

It is claimed that a fiduciary relation existed between the mother and each one of her children, which imposes upon each one of them the obligation of showing that no undue influence was exercised to procure the execution of these deeds. The relation of parent and child does not constitute a confidential relation which imposes upon the child, in the case of a gift from the parent, the duty of producing evidence that no undue influence was exercised to induce the gift. In addition to this relation there must be proof of the domination by the person standing in the fiduciary relation over the other person and the exercise of such

domination in the particular transaction. The evidence shows that William J. Healy managed his mother's business after his father's death until his own death, in December, 1918, and might justify the inference of a fiduciary relation. After his death Thomas Healy occupied the same relation to his mother that his brother had, and during those years his relation to his mother was of a fiduciary capacity. When he ceased to have charge of the management of the farms, in 1925, Charles succeeded to the same relation, and when these deeds were made his relation to his mother was of a fiduciary capacity and he was subject to the disabilities arising out of such relation, so that in order to sustain any transaction with his mother to his advantage it was necessary for him to show that it was free from any undue influence on his part but was the free, voluntary and independent act of his mother. If the deed to Charles stood alone he would probably be subject to the requirement of showing that his mother's action was of her own will, without the pressure of any undue influence exerted on her by him. But it does not stand alone. It is a part of the general disposition of her whole estate. He took no part in procuring the deed to be made to himself further than to bring McHenry from his office to Mrs. Healy's house. Mrs. Healy took the initiative when McHenry arrived. The property divided by these four deeds among the grantees, after deducting the mortgages, amounts to $79,500. If it were all left to descend under the Statute of Descent, Charles would receive one-seventh, which is $11,285. What he does receive under the deed is one-half of the value of the land included in the deed, $47,000 to him and Carleton, less the $25,000 mortgage on it, being one-half of $22,000, or $11,000. The transaction does not show on its face that it was to the advantage of Charles, but it was a part of the plan for the division of the estate which his mother had devised and by which his sisters received much more than he did. In connection with the

testimony of McHenry, this evidence justifies the conclusion that the plan was the result of Mrs. Healy's own wishes.

The delivery of the deeds to McHenry, with directions to deliver them to the grantees after the death of the grantor, was a good delivery in escrow, and the presumption of the acceptance of a deed under such circumstances by the grantee will prevail where the conveyance is beneficial to the grantee, as were the deeds to Mabel˙ Stevens and Ruth Wheeler. (*Bullard* v. *Suedmeier,* 291 Ill. 400; *Thurston* v. *Tubbs,* 257 id. 465; *Argile* v. *Fulton,* 295 id. 569; *Phenneger* v. *Kendrick,* 301 id. 163.) Each of the other two deeds was subject to a mortgage for $25,000 and contained a clause of assumption by the grantee. They therefore imposed a burden upon the grantees, and some proof of acceptance is necessary to a complete delivery to them. These deeds were filed for record by the custodian of them on January 26, 1929, after the beginning of this suit. Such filing for record was an evidence of intention to accept the deeds and related back to their delivery by the grantor to the custodian. Moreover, the grantees in those deeds appeared in this case and by their answers insisted upon the validity of those deeds and the delivery of them. It is immaterial that the grantees, or any of them, may not have known of the existence of the deeds until after the death of the grantor, and an acceptance was not necessary before her death. *Little* v. *Eaton,* 267 Ill. 623; *Thompson* v. *Calhoun,* 216 id. 161.

The decree is reversed except as to that part of it directing the partition of tract No. 8, which is affirmed, and the cause is remanded, with directions to dismiss the bill as to all the land except tract No. 8.

*Reversed in part and remanded, with directions.*

Mr. JUSTICE HEARD took no part in this decision.